Filed 3/23/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JORGE LUIS ESTRADA et al., | G058397, G058969 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 30-2013-00692890) |
| ROYALTY CARPET MILLS, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order and judgment of the Superior Court of Orange County, Randall J. Sherman, Judge.  Affirmed in part, reversed in part and remanded with directions.

Ginez, Steinmetz & Assoc., Rudy Ginez, Jr.; CE Smith Law Firm and Clifton E. Smith for Plaintiffs and Appellants.

Baker & Hostetler, Daniel F. Lula, Vartan S. Madoyan and Joseph S. Persoff for Defendant and Appellant.

\*          \*          \*

The plaintiffs in this case were employees at three separate carpet manufacturing facilities operated by defendant Royalty Carpet Mills, Inc. (Royalty), which is now known as Royalty Carpet Mills, LLC. They alleged representative claims under the Private Attorneys General Act (PAGA; Lab. Code § 2698 et seq.),[1] and class claims primarily based on purported meal and rest period violations. They sought premium pay under section 226.7 for these violations and asserted derivative claims for waiting time and wage statement penalties, among others. The trial court initially certified two classes: one for employees that worked at a facility in Porterville (the Porterville class) and another for employees that worked in two separate facilities in Orange County (the Dyer/Derian class). Following the presentation of evidence at trial, the court decertified the Dyer/Derian class and then entered judgment. The results were mixed and both sides appeal.

Plaintiffs make several contentions on appeal: (1) certain releases in settlement agreements that Royalty made with individual class members prior to trial are invalid; (2) the court erred in finding the Porterville class's meal period claim, which was added in an amended complaint, did not relate back to any prior complaint; (3) the court abused its discretion by decertifying the Dyer/Derian class; (4) the court incorrectly applied a seven percent prejudgment interest rate to premium pay awarded under section 226.7 rather than a 10 percent rate; (5) the court's judgment for Royalty on the Porterville class's derivative waiting time and wage statement claims was wrong; and (6) the court mistakenly dismissed the PAGA meal period claims of the Dyer/Derian employees on unmanageability grounds. As explained in this opinion, we agree with three of these contentions. We find the court erred in failing to apply the relation back doctrine, in decertifying the Dyer/Derian class, and dismissing the PAGA claims as unmanageable.

---

[1] All further undesignated statutory references are to the Labor Code.

2

We publish this opinion primarily due to our discussion concerning unmanageable PAGA claims. Currently, only one published California opinion, *Wesson v. Staples the Office Superstore, LLC* (2021) 68 Cal.App.5th 746 (*Wesson*), addresses this issue. It concluded courts have inherent authority to strike unmanageable PAGA claims. (*Id.* at pp. 766-767.) While we understand the concerns expressed in *Wesson*, we reach the opposite conclusion. Based on our reading of pertinent Supreme Court authority, chiefly *Arias v. Superior Court* (2009) 46 Cal.4th 969, and *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, we find a court cannot strike a PAGA claim based on manageability. These cases have made clear that PAGA claims are unlike conventional civil suits and, in particular, are not class actions. Allowing dismissal of unmanageable PAGA claims would effectively graft a class action requirement onto PAGA claims, undermining a core principle of these authorities. It would also interfere with PAGA's purpose as a law enforcement mechanism by placing an extra hurdle on PAGA plaintiffs that is not placed on the state. That said, courts are not powerless when facing unwieldy PAGA claims. Courts may still, where appropriate and within reason, limit the amount of evidence PAGA plaintiffs may introduce at trial to prove alleged violations to other unrepresented employees. If plaintiffs are unable to show widespread violations in an efficient and reasonable manner, that will just reduce the amount of penalties awarded rather than lead to dismissal.

As for Royalty, it makes two arguments in its cross-appeal. First, it asserts the trial court incorrectly found it liable to the Porterville class for meal period violations. We find the court correctly ruled that the meal policy at Porterville, which required employees to remain at the facility during meal breaks, violated governing law. Second, while the court dismissed the Dyer/Derian employees' PAGA meal period claim as unmanageable, it awarded the named plaintiffs individual PAGA penalties. Royalty contends courts cannot award PAGA penalties to individual plaintiffs because such claims can only be brought in a representative capacity. We need not address this

argument given our finding that the court erred by dismissing the PAGA claim as unmanageable.

For these reasons, we reverse the trial court's order decertifying the Dyer/Derian class and dismissing the related PAGA claim as unmanageable, and we affirm and reverse various aspects of the court's judgment.

# I

## FACTS AND PROCEDURAL HISTORY

### A. *The Complaints*

Royalty operated warehouses and carpet manufacturing facilities at various locations in California until June 14, 2017, when it ceased operations. Three facilities are relevant to this appeal. The first facility was in Porterville, California (Porterville), which is part of Tulare County. The two other facilities were in Orange County on Dyer Road in Santa Ana (Dyer) and Derian Avenue in Irvine (Derian).[2]

Plaintiff Jorge Estrada was a dye weigher at Derian. On December 13, 2013, he filed a complaint against Royalty alleging causes of action for (1) meal period violations (§§ 226.7, 512, subd. (a)); (2) rest period violations (§ 226.7); (3) waiting time penalties (§ 203); (4) wage statement penalties (§ 226, subd. (e)); (5) unlawful business practices (Bus. & Prof. Code, § 17200; UCL); and (6) PAGA penalties (§ 2698, et seq.). All these claims were asserted individually, except for the PAGA claim. He later filed a first amended complaint, which is immaterial to this appeal.

A second amended complaint (SAC) was filed on October 22, 2014, by Estrada and new plaintiff Paulina Nava Medina, a mender and creeler at Dyer. The SAC retained the PAGA claim and realleged Estrada's individual claims as class claims. The

---

[2]  Royalty operated another manufacturing facility located on Red Hill Avenue in Irvine. No claims were brought on behalf of the employees at trial, so they are irrelevant to this appeal.

4

proposed class covered Royalty's employees at Dyer, Derian, and Porterville, specifically, "[a]ll current and former nonexempt employees of [Royalty], who worked in its carpet manufacturing and warehouse facilities in California at any time from December 13, 2009, through the date of judgment."

In 2016, Royalty made settlement proposals to individual putative class members, offering them payments of varying amounts in exchange for a release of their claims. In all, 232 out of 388 putative class members accepted and entered into settlement agreements with Royalty (about 60 percent of the putative class), while 156 refused. The specific distribution among facilities was (1) for Dyer, 66 putative class members settled and 59 did not; (2) for Derian, 51 putative class members settled and 40 did not; and (3) for Porterville, 115 class members settled and 57 did not.

A third amended complaint (TAC), the operative complaint at trial, was filed on November 17, 2016. The TAC's proposed class was virtually the same as the SAC. But, along with Estrada and Medina, the TAC added 11 new plaintiffs, several of which worked at Porterville. In all, the TAC alleged seven class claims and one representative PAGA claim: (1) meal period violations, (2) rest period violations, (3) wage statement penalties, (4) waiting time penalties, (5) penalties under section 558, (6) PAGA penalties, (7) UCL violations, and (8) declaratory relief. These claims are summarized below.

Of particular relevance on appeal is plaintiffs' meal period claim. In the SAC, the meal period claim was primarily based on allegations that Royalty failed to provide timely first meal periods and deprived employees of second meal periods. The TAC included these theories but also alleged Porterville had a unique policy that prevented employees from leaving the facility during meal periods (the on-premises meal policy). Plaintiffs asserted Porterville's on-premises meal policy was facially unlawful. As for the rest break claim, it was based on allegations that Royalty did not allow

employees at the three facilities to take their required rest breaks or discouraged them from doing so.

Plaintiffs' claims for wage statement and waiting time penalties were derivative of their meal and rest break claims. As background, if an employer fails to provide an employee with a lawful meal or rest break, section 226.7, subdivision (c) requires the employer to pay the employee "one additional hour of pay at the employee's regular rate of compensation." This is commonly known as "premium pay." (See *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 67-68, 78 (*Donohue*).) Plaintiffs asserted Royalty failed to provide premium pay for the meal and rest break violations alleged in their complaint. Due to this failure, they asserted their wage statements were inaccurate because they did not include the premium pay to which they were entitled. Likewise, plaintiffs sought waiting time penalties because Royalty failed to provide this allegedly owed premium pay to employees upon separation from employment.

Plaintiffs' PAGA claim was based on the alleged violations of the Labor Code set forth above, and their UCL claim was similarly based on the alleged meal and rest period violations. Finally, the new declaratory relief claim sought to invalidate the releases in the individual settlement agreements on grounds they were void and unenforceable.[3]

## B. Class Certification

Nine of the 13 named plaintiffs moved for class certification in June 2017 (it is unclear why only nine made the motion). They sought certification of two separate classes. Both classes consisted of nonexempt employees employed by Royalty between December 13, 2009, and June 14, 2017 (the date Royalty closed), with one class of

---

[3] The section 558 claim was not pursued at trial for unexplained reasons. We note that just prior to the entry of judgment in this case, our Supreme Court held a plaintiff may not bring a private right of action under section 558 or seek PAGA penalties for a violation of this statute. (*ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 181-182.)

6

Porterville workers and another class of Dyer and Derian workers. Plaintiffs also requested that each class be divided into separate subclasses for each claim. The motion was heard and partially granted by Judge Kim G. Dunning.

As to the Porterville workers, the court certified a Porterville class consisting of "'[a]ll former nonexempt, hourly employees of [Royalty], who worked at the Porterville carpet manufacturing and warehouse facility at any time from December 13, 2009 through June 14, 2017.'" The court also certified three subclasses within the Porterville class: (1) a meal period subclass to determine whether Porterville's on-premises meal policy was lawful; (2) a rest period subclass to determine whether Royalty's rest period policies at Porterville were facially lawful; and (3) a release subclass to determine whether Porterville class members' settlement releases were enforceable.

The court also certified a Dyer/Derian class composed of "'[a]ll former nonexempt, hourly employees of [Royalty], who worked at either the Dyer or Derian carpet manufacturing and warehouse facility at any time from December 13, 2009 through June 14, 2017.'" As with the Porterville class, the court certified three subclasses within this class: (1) a meal period subclass to determine whether Dyer/Derian class members were provided timely first meal periods and/or deprived of second meal periods; (2) a rest period subclass to determine whether Royalty's rest period policies at Dyer and Derian were facially lawful; and (3) a release subclass to determine whether the Dyer/Derian class members' settlement releases were enforceable.

Finally, the court certified subclasses for all derivative claims tied to the above certified issues, including claims for premium pay, wages statement penalties, waiting time penalties, and unfair business practices. Five named plaintiffs were found to be suitable class representatives for the Dyer/Derian class, and four named plaintiffs were found to be suitable representatives for the Porterville class.

7

Prior to trial, Royalty brought a motion to decertify the class, but it was denied due to Royalty's failure to show changed circumstances warranting decertification.

*C. Trial*

A bench trial before Judge Randall J. Sherman began in November 2018 and resumed in April and May 2019. At trial, plaintiffs' case consisted of live testimony from 12 of the 13 named plaintiffs, deposition testimony from four different managers and officers of Royalty, live testimony from two of Royalty's human resources employees, and live testimony from an expert witness. After plaintiffs rested, Royalty moved mid-trial to decertify the classes and for judgment under Code of Civil Procedure section 631.8.

Following argument on Royalty's motions, the court provided rulings on the issues raised. First, the court granted judgment as to plaintiffs' third cause of action for wage statement penalties and fourth cause of action for waiting time penalties. As to the former, the claim failed because the wage statements accurately reported what was paid. As to the latter, plaintiffs had not shown that Royalty's failure to pay any wages was willful. Second, the court dismissed the portion of plaintiffs' PAGA claim based on Porterville's on-premises meal policy due to plaintiffs' failure to exhaust administrative remedies. Third, it decertified both rest break subclasses due to insufficient evidence supporting class treatment. But the court denied Royalty's mid-trial request to decertify the Dyer/Derian meal break subclass, and it required Royalty to put on its defense to this claim. Likewise, it denied Royalty's motion as to the Porterville class's meal period claim, which was based on the on-premises meal policy.

Following these rulings, Royalty presented its defense, which included testimony from two former employees and an expert witness. Plaintiffs then called a rebuttal witness and rested.

8

Prior to closing arguments, the court inquired about the proper limitations period for the Porterville class's meal period claim. Previously, Judge Dunning had found the limitations period for this claim commenced on December 13, 2009, which was calculated by applying a four-year statute of limitations to the date the action was filed. But the court noted Porterville's on-premises meal policy was first alleged in the TAC. Accordingly, it questioned whether the statute of limitations on this claim should run from the filing of the TAC or a prior complaint. This issue was significant, as it would greatly affect any recovery of the Porterville class. The court directed the parties to address this issue in their closing arguments.

### D. Rulings and Judgment

#### 1. Class claims

As to the first cause of action for meal period violations, the court issued an order decertifying the Dyer/Derian meal period subclass. The court found there were too many individualized issues to support class treatment. That order likewise dismissed the portion of the PAGA claim (sixth cause of action) based on meal period violations at Dyer and Derian because the individualized issues made it unmanageable.

With regard to the Porterville class's meal period claims, the court concluded Royalty's on-premises meal policy was unlawful. But it determined this claim was first asserted in the TAC and did not relate back to any prior pleading. As such, it found the four-year statute of limitations on this claim ran backwards from the filing of the TAC, restricting the class recovery for this claim to violations occurring between November 17, 2012 (four years from the filing date of the TAC), to June 14, 2017 (the

9

date Royalty closed).[4]  Based on these meal period violations, the court also found

Royalty liable to the Porterville class for UCL violations (seventh cause of action).  For

the meal period and UCL claims, the court awarded the Porterville class $555,752,

consisting of $436,963 in unpaid premium pay and $118,789 in prejudgment interest

calculated at a rate of 7 percent per annum.  As explained above, no PAGA penalties

(sixth cause of action) were awarded to the Porterville employees for meal period

violations because plaintiffs failed to exhaust their administrative remedies.

The court also confirmed its prior rulings granting Royalty's mid-trial

motions to decertify the rest break subclasses (second cause of action) and for judgment

on plaintiffs' third cause of action for wage statement penalties and fourth cause of action

for waiting time penalties.  Finally, as to the eighth cause of action concerning the

validity of the releases, the court found this issue was only relevant to the Porterville

class's meal period claims since the Dyer/Derian class had been decertified and it had

found no liability on the rest break claims.  The court ruled these releases were valid

because there was a bona fide dispute as to whether Royalty owed the Porterville class

any premium pay for meal period violations.

### 2. Individual claims

Since the trial court decertified the Dyer/Derian meal period subclass, it

granted judgment to four of the named Dyer/Derian plaintiffs on their individual meal

period claims and derivative UCL claims.[5]  Though the court dismissed their

---

[4]  The Porterville on-premises meal policy remained in place after Royalty entered into settlements agreements with individual class members.  Since settling Porterville class members only released claims up to the date of their settlements, the court awarded them premium pay for the meal period violations that occurred after their settlements were entered into.

[5]  The parties do not explain why only four of the five class representatives for the Dyer/Derian class were awarded damages.  But it appears one of the class representatives did not testify at trial and, consequently, was not awarded any damages.

representative PAGA claims based on unmanageability, it found the named Dyer/Derian plaintiffs had established individual PAGA violations and awarded each of them PAGA penalties. These four named plaintiffs were awarded amounts ranging from $9,516.01 to $27,047.84, consisting of unpaid premium pay, prejudgment interest at a rate of 7 percent, and individual PAGA penalties.

The court entered judgment on January 16, 2020. Both sides now appeal the judgment, and plaintiffs also appeal the court's order decertifying the Dyer/Derian meal period subclass and dismissing the related Dyer/Derian PAGA claim as unmanageable.

## II

## DISCUSSION

Plaintiffs assert several errors on appeal. First, the court erroneously ruled the releases were valid. Second, the court improperly failed to apply the relation back doctrine to the statute of limitations for the Porterville class's meal period claims. Third, the court's decision to decertify the Dyer/Derian meal period subclass was incorrect. Fourth, the court should have applied a prejudgment interest rate of 10 percent rather than 7 percent to the unpaid premium pay awarded. Fifth, the court erred by failing to award the Porterville class waiting time and wage statement penalties. Sixth, the court wrongly dismissed as unmanageable the Dyer/Derian plaintiffs' PAGA claim that was based on meal period violations.

Royalty makes two arguments in its cross-appeal. First, it contends Porterville's on-premises meal policy is lawful, and, therefore, the Porterville class is not owed any premium pay for meal period violations. Second, it claims the court erred in awarding PAGA penalties to individual plaintiffs because PAGA claims can only be brought in a representative capacity. The issues raised by Royalty all overlap with

11

various issues raised by plaintiffs. We begin our analysis with these overlapping issues and then address plaintiffs' remaining arguments.

In short, we agree with plaintiffs' contentions that the trial court should have applied the relation back doctrine, erred in decertifying the Dyer/Derian meal period subclass, and wrongly dismissed as unmanageable the portion of the Dyer/Derian PAGA claim based on meal period violations. As to the remaining arguments, we either disagree with them or find they no longer need to be addressed based on our other rulings.

## A. *Meal Period Premiums*

Both appeal and cross-appeal require us to determine whether Royalty's on-premises meal policy was lawful. Royalty claims the court erred by ruling the policy was unlawful and awarding the Porterville class premium pay for meal period violations based upon it. Plaintiffs fervently disagree. Indeed, they assert there is no good faith dispute that the on-premises meal policy was lawful, and they maintain Royalty clearly owed Porterville class members premium pay for these obvious Labor Code violations. Further, because no good faith dispute exists on these issues, they contend any settlement releases of premium pay for these meal period violations are invalid. We agree with the court that the on-premises meal policy was unlawful, and, as such, Royalty owed the Porterville class premium pay. We also agree with the court's finding that Royalty had a good faith dispute that its on-premises meal policy was legal and, therefore, the settlement releases of premium pay arising from this policy are valid. We start by evaluating the lawfulness of the on-premises meal policy.

### 1. *The on-premises meal policy*

"An employer generally must provide a 30-minute meal period to all nonexempt employees who work more than five hours, and a second 30-minute meal

12

period to employees who work more than 10 hours." (*Lampe v. Queen of the Valley Medical Center* (2018) 19 Cal.App.5th 832, 847.) The first meal period must occur no later than five hours after work begins, and the second period must occur no later than 10 hours after work begins. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1041-1042 (*Brinker*).) Both meal periods can be waived by agreement under certain conditions. The first meal period can be waived if the employee works no more than six hours in a day, and the second can be waived if the employee works no more than 12 hours in a day and the first meal period was not waived. (§ 512, subd. (a).) "If an employer fails to provide an employee a meal . . . period in accordance with a state law, . . . the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal . . . period is not provided." (§ 226.7, subd. (c).)

Meal periods must be taken either on duty or off duty. "'Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked.'" (*Brinker*, *supra*, 53 Cal.4th at p. 1035.) On-duty meal periods are only permitted by written agreement between the parties when the nature of the work prevents an employee from being relieved of all duty. (*Ibid*.) "[A]bsent such circumstances, an employer is obligated to provide an 'off-duty' meal period . . . in which the employee '*is* relieved of all duty during [the] 30-minute meal period.'" (*Ibid*.)

The relevant aspects of Porterville's on-premises meal policy are largely undisputed. Nonexempt workers at Porterville were relieved of all duty during their 30-minute lunch period but were required to remain at the facility. Importantly, Royalty *paid* the Porterville workers their regular wages during meal periods, but it did not give them premium pay for having to remain on the premises. Royalty insists its on-premises meal policy was lawful because its workers were relieved of duty and paid wages during the meal period. We are unconvinced.

13

It is uncontested the meal periods at issue were taken off duty, not on duty. When taken off duty, the "meal period requirement is satisfied if the employee (1) has at least 30 minutes uninterrupted, (2) *is free to leave the premises*, and (3) is relieved of all duty for the entire period." (*Brinker*, *supra*, 53 Cal.4th at p. 1036, italics added.) "Employers must afford employees uninterrupted half-hour periods in which they are relieved of any duty or employer control and are *free to come and go as they please*." (*Id*. at p. 1037, italics added.) "'The worker must be free to attend to <u>any</u> personal business he or she may choose during the unpaid meal period.'" (*Id*. at p. 1036.) "If an employer does not provide an employee with a compliant meal period, then the employer must provide the employee with premium pay for the violation." (*Donohue*, *supra*, 11 Cal.5th at pp. 67-68.) Since Porterville workers were not free to leave the premises, Royalty's on-premises meal policy was noncompliant, so it was obligated to provide premium pay to these employees.

Royalty maintains *Brinker*'s primary emphasis for off-duty meal periods was relieving employees of work, not freedom of movement. It cites various portions of *Brinker* that describe the employer's obligation as relieving its employees of duty without mentioning freedom of movement. It also cites a portion of *Brinker* summarizing the Court's holding: "[t]he employer satisfies [its meal period] obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so. *What will suffice may vary from industry to industry . . . .*" (*Brinker*, *supra*, 53 Cal.4th at p. 1040, italics added.) Based on these citations, Royalty suggests the core requirement of off-duty meal periods is relief from duty and that freedom of movement, while important, can vary based on industry.

It is true that *Brinker* primarily mentions relief from duty as the hallmark of off-duty meal periods, and it does so at a far greater rate than freedom of movement. Still, it contains several unambiguous statements that employees must be given freedom

14

of movement for an employer to satisfy the off-duty meal period requirement. Though Royalty relieved the Porterville class members of duty during their meal periods, it did not provide compliant meal periods because workers were not free to leave the premises. (*Brinker*, *supra*, 53 Cal.4th at pp. 1036-1037.) Consequently, these workers are owed premium pay for these noncompliant meal periods. (*Id*. at p. 1018; *Donohue*, *supra*, 11 Cal.5th at pp. 67-68.) We need not decide whether certain industries may restrict their employees' freedom of movement during meal breaks. Even if there is some flexibility to this standard, Royalty has not cited anything in the record showing an exception to the general rule is warranted here.

Royalty also compares off-duty meal periods to off-duty rest periods. For the latter, our Supreme Court has suggested employers can lawfully require employees to remain on the premises. (See *Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 270.) Royalty contends the same should be true for off-duty meal periods. Not so. The Court has unequivocally stated employers must afford employees meal periods in which they "are free to come and go as they please." (*Brinker*, *supra*, 53 Cal.4th at p. 1037.) Further, there are material differences between rest breaks and meal breaks namely, their length. "Because rest periods are 10 minutes in length [citation], they impose practical limitations on an employee's movement. That is, during a rest period an employee generally can travel at most five minutes from a work post before returning to make it back on time. Thus, one would expect that employees will ordinarily have to remain on site or nearby. This constraint, which is of course common to all rest periods, is not sufficient to establish employer control." (*Augustus*, at p. 270.) The analogy to rest periods is unpersuasive since meal periods are three times longer and are not subject to the same time constraints.

15

## 2. *Offsets to premium pay*

As a fallback argument, Royalty suggests the amount of premium pay awarded by the court should be offset by the regular wages it paid to Porterville employees during their meal periods. But no offset applies because premium pay under section 226.7 serves a different purpose than wages. Rather than compensating employees for time worked, it is awarded for the noneconomic injuries suffered by them due to deprivation of a compliant meal period.

"Section 226.7 is not aimed at protecting or providing employees' wages. Instead, the statute is primarily concerned with ensuring the health and welfare of employees by requiring that employers provide meal and rest periods as mandated . . . ." (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1255.) Even if the employee "is paid for the 30 minutes of work, the employee has been deprived of the right to be free of the employer's control during the meal period." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1104.) Noncompliant meal periods "den[y] employees time free from employer control that is often needed to be able to accomplish important personal tasks." (*Id.* at p. 1113.) "Section 226.7 provides the only compensation for these injuries." (*Id.* at p. 1104.)

Moreover, "even a minor infringement of the meal period triggers the premium pay obligation." (*Donohue*, *supra*, 11 Cal.5th at pp. 67-68.) "In the meal period context, an employee receives the full amount of premium pay . . . regardless of the extent of the violation. [Citations.] In other words, whether an employer provides a shortened meal period or no meal period at all, the employee receives one additional hour of pay." (*Id.* at p. 69.) "The premise of this approach is that even relatively minor infringements on meal periods can cause substantial burdens to the employee." (*Ibid.*) "By requiring premium pay for any violation, no matter how minor, the structure makes clear that employers must provide compliant meal periods whenever such a period is triggered." (*Ibid.*)

16

### 3. *Validity of class members' releases*

Porterville class members that settled with Royalty released, among other things, their right to any premium pay for meal period violations owed up to the date of the settlement. Plaintiffs claim these releases are invalid. They contend Royalty's on-premises meal policy was patently unlawful, and Royalty could not settle this claim to avoid its obvious premium pay obligations. We agree with the trial court that Royalty had a good faith dispute as to the lawfulness of this policy, and, therefore, the releases at issue are valid.[6]

The applicable statute is section 206.5, subdivision (a), which prevents an employer from "requir[ing] the execution of a release of a claim or right on account of wages due, or to become due, . . . unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee." (§ 206.5, subd. (a).) This statute is read along with section 206, subdivision (a), which states that in wage disputes, "the employer shall pay . . . all wages, or parts thereof, conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled to as to any balance claimed." (§ 206, subd. (a); *Watkins v. Wachovia Corp.* (2009) 172 Cal.App.4th 1576, 1586-1587.)

Together, these statutes "prohibit[] employers from coercing settlements by withholding wages concededly due. [W]ages are not considered 'due' and unreleasable under Labor Code section 206.5, unless they are required to be paid under Labor Code section 206. When a bona fide dispute exists, the disputed amounts are not 'due,' and the bona fide dispute can be voluntarily settled with a release and a payment—even if the payment is for an amount less than the total wages claimed by the employee." (*Watkins v. Wachovia Corp.*, *supra*, 172 Cal.App.4th at pp. 1586-1587.) In other words, "'wages

---

[6] The parties dispute the proper standard of review. Royalty believes the substantial evidence standard applies, while plaintiffs assert our review is de novo. We need not decide since our decision would be the same under either standard.

17

are not "due" if there is a good faith dispute as to whether they are owed.'" (*Chindarah v. Pick Up Stix, Inc.* (2009) 171 Cal.App.4th 796, 802.)

As discussed above, Royalty contends the Porterville on-premises meal policy is lawful and disputes owing Porterville class members any premium pay. While we disagree, Royalty's position is not so untenable as to constitute bad faith. As set forth above, *Brinker* primarily focused on relief from duty and suggested meal period requirements "may vary from industry to industry." (*Brinker*, *supra*, 53 Cal.4th at p. 1040.) Further, employers need only pay regular wages for on-duty meal periods, not premium pay. (*Id*. at pp. 1035-1036, 1039-1040.) From this, it was not unreasonable for Royalty to believe it could restrict employee freedom of movement during meal periods if it provided relief from duty and regular wages.

Royalty's position is also supported by statements on the Frequently Asked Questions (FAQ) section of the Department of Labor Standards Enforcement's website. For example, Royalty cites a portion of the FAQ containing the following guidance:

"**Q. Can my employer require that I stay on its premises during my meal period?**"

"A. Yes, your employer can require that you remain on its premises during your meal period, even if you are relieved of all work duties. However[,] if that occurs, you are being denied your time for your own purposes and in effect remain under the employer's control and thus, *the meal period must be paid*. [I]f you are required to eat on the premises, a suitable place for that purpose must be designated. 'Suitable' means a sheltered place with facilities available for securing hot food and drink or for heating food or drink, and for consuming such food and drink." (Italics added.)

This guidance fails to mention premium pay and suggests on-premises meal policies are legally compliant if employees are paid wages. In response, plaintiffs cite a portion of the FAQ stating that "to satisfy its obligation to provide a meal period, an employer must actually relieve employees of all duty, relinquish control over their

18

activities, permit them a reasonable opportunity to take an uninterrupted 30-minute break (in which they are free to come and go as they please), and must not impede or discourage employees from taking their meal period." They then quote a separate section of the FAQ stating that "[i]f an employer fails to provide an employee a meal period in accordance with an applicable IWC Order, the employer must pay one additional hour of pay at the employee's regular rate of pay for each workday that the meal period is not provided."

These portions of the FAQ do not clearly state Royalty had to provide premium pay *and* regular wages if it required employees to remain on premises during meal periods. Rather, based on the portion of the FAQ Royalty cites, Royalty could reasonably conclude it could satisfy its meal period obligation by paying employees their regular wages during meal periods.

## B. The Dyer/Derian Employees' PAGA Claim

The trial court dismissed the Dyer/Derian employees' representative PAGA meal period claim due to unmanageability. It then awarded PAGA penalties to the named Dyer/Derian plaintiffs in an individual capacity. On appeal, plaintiffs maintain PAGA claims have no manageability requirement. Relatedly, Royalty cross-appeals on grounds the court improperly awarded individual PAGA penalties to four Dyer/Derian plaintiffs, arguing PAGA claims can only be brought in a representative capacity. Since we agree with plaintiffs that a trial court cannot dismiss a PAGA claim based on manageability, we need not address Royalty's cross-appeal.

### 1. Manageability

The trial court's order decertifying the Dyer/Derian meal break subclass also dismissed "[t]he meal break-related claims that Plaintiffs bring for the Dyer and Derian locations under [PAGA] . . . because, for the various reasons noted [in the

19

decertification order], there are numerous individualized issues that render Plaintiffs' PAGA meal break claims unmanageable."[7] Since we conclude a court cannot dismiss a PAGA claim based on manageability, we reverse this portion of the order and remand for further proceedings in light of this opinion.

We know of only one published California case that has considered whether a trial court may dismiss an unmanageable PAGA claim. A recently decided case, *Wesson*, *supra*, 68 Cal.App.5th at pages 765-766, held that "courts have inherent authority to ensure that PAGA claims can be fairly and efficiently tried and, if necessary, may strike a claim that cannot be rendered manageable." It reasoned, "[a] PAGA action may . . . cover a vast number of employees, each of whom may have markedly different experiences relevant to the alleged violations. Under those circumstances, determining whether the employer committed Labor Code violations with respect to each employee may raise practical difficulties and may prove to be unmanageable." (*Ibid*.) "[A] court is [not] powerless to address the challenges presented by large and complex PAGA actions and is [not] bound to hold dozens, hundreds, or thousands of minitrials involving diverse questions, depending on the breadth of the plaintiff's claims. [C]ourts have inherent authority to manage litigation with the aim of protecting the parties' rights and the courts' ability to function. [Citation.] [T]rial courts may . . . exercise their inherent authority to ensure the manageability of PAGA claims and, if necessary, may preclude the use of this procedural device." (*Id*. at pp. 766-767.) That is, courts may strike PAGA claims deemed to be unmanageable.

---

[7] The court's statement of decision provides "[t]he court did not award PAGA penalties for Dyer and Derian employees who were not named plaintiffs because plaintiffs failed to show Labor Code violations as to them." This failure to find Labor Code violations, however, was tied to the court's decision to dismiss the PAGA claim as unmanageable. The court explained in its oral ruling that it was awarding PAGA penalties to individual plaintiffs because "there [was] no group of [aggrieved] employees" due to its decision to decertify the class.

Aside from *Wesson*, federal district courts disagree as to whether PAGA claims can be struck based on to manageability. Some courts believe allowing dismissal of unmanageable PAGA claims conflicts with PAGA's purpose. "PAGA contemplates civil penalties for 'a violation' of the California Labor Code . . . , which will often require individualized assessments of liability. [Citations.] The purpose of PAGA 'is to incentivize private parties to recover civil penalties for the government that otherwise may not have been assessed and collected by overburdened state enforcement agencies.' [Citation.] Holding that individualized liability determinations make representative PAGA actions unmanageable, and therefore untenable, would impose a barrier on such actions that the state law enforcement agency does not face when it litigates those cases itself. [Citations.] Imposing such a requirement, found nowhere in PAGA itself and apparently not imposed upon the government, would 'obliterate [the] purpose' of representative PAGA actions. [Citation.] Seeking civil penalties on behalf of aggrieved employees may make plaintiff's case difficult to prove, and may require evidence regarding a significant number of individual employees. But PAGA actions are unlike class actions; they are 'distinct in purpose and function from a purely procedural rule,' . . . the purpose of PAGA is not 'to allow a collection of individual plaintiffs to sue the same defendant in one consolidated action for the sake of convenience and efficiency.' [Citation.] In short, the imposition of a manageability requirement—which finds its genesis in [class action procedure]—makes little sense in this context." (*Zackaria v. Wal-Mart Stores, Inc.* (C.D. Cal. 2015) 142 F.Supp.3d 949, 959-960 (*Zackaria*).)

In contrast, district courts that have struck unmanageable PAGA claims have done so on similar grounds as *Wesson*. They believe PAGA claims can be stricken "where establishing liability based on Labor Code violations would be unmanageable due to the individualized assessments required to prove violations based on the plaintiff's allegations and the defendant's evidence of the necessary inquiries." (*Amiri v. Cox Communications California, LLC* (C.D. Cal. 2017) 272 F.Supp.3d 1187, 1193-1194.)

21

Like *Wesson*, these district courts have determined unmanageable PAGA claims can be struck under the court's inherent authority. Such power is not "'"governed . . . by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."'" (*Valadez v. CSX Intermodal Terminals, Inc.* (N.D. Cal. 2018) 298 F.Supp.3d 1254, 1266.)

After reviewing both perspectives, we respectfully disagree with *Wesson* and agree with the reasoning of the district courts that have refused to dismiss PAGA claims based on manageability. As our Supreme Court has clarified, "'a representative action under PAGA is not a class action.'" (*Kim v. Reins International California, Inc.*, *supra*, 9 Cal.5th at pp. 86-87.) "The latter is a procedural device for aggregating claims 'when the parties are numerous, and it is impracticable to bring them all before the court.'" (*Ibid.*) In comparison, PAGA claims are administrative law enforcement actions that "are different from conventional civil suits. The Legislature's sole purpose in enacting PAGA was 'to augment the limited enforcement capability of the [Labor Workforce Development Agency (LWDA)] by empowering employees to enforce the Labor Code as representatives of the Agency.' [Citations.] Accordingly, a PAGA claim is an enforcement action between the LWDA and the employer, with the PAGA plaintiff acting on behalf of the government." (*Id.* at p. 86.) The civil penalties recovered in a PAGA action are "recovered on the state's behalf [and] are intended to 'remediate present violations and deter future ones,' *not* to redress employees' injuries." (*Ibid.*)

Due to their differences, our Supreme Court has held that PAGA plaintiffs need not meet class action certification requirements when pursuing PAGA penalties. (*Arias v. Superior Court*, *supra*, 46 Cal.4th at p. 975; see *Kim v. Reins International California, Inc.*, *supra*, 9 Cal.5th at pp. 86-87.) As district courts have noted, though, dismissal of a claim based on manageability is rooted in class action procedure. (*Zackaria*, *supra*, 142 F.Supp.3d at pp. 958-959.) Indeed, manageability is a key requirement for class certification. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th

22

1, 28-29.)  Accordingly, requiring that PAGA claims be manageable would graft a crucial element of class certification onto PAGA claims, undercutting our Supreme Court's prior holdings.

Moreover, unlike a typical civil action, PAGA claims are effectively administrative enforcement actions.  The plaintiff acts "as the proxy or agent of the state's labor law enforcement agencies" and "represents the same legal right and interest as state labor law enforcement agencies—namely, recovery of civil penalties that otherwise would have been assessed and collected by the [LWDA]." (*Arias v. Superior Court*, *supra*, 46 Cal.4th at p. 986.)  "PAGA is a civil action only in the sense that its designated forum is the trial courts.  PAGA plaintiffs are still mere proxies for the state, bringing what would otherwise be an administrative regulatory enforcement action on its behalf.  The action is still subject to the same legal rights and interests as the state." (*LaFace v. Ralphs Grocery Company* (Feb. 18, 2022, B305494) __ Cal.App. 5th__, __ [2022 WL 498847, p. *7] (*LaFace*).)  "[A] PAGA litigant's status as 'the proxy or agent' of the state [citation] is not merely semantic; it reflects a PAGA litigant's substantive role in enforcing our labor laws on behalf of state law enforcement agencies."  (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 387-388; *Williams v. Superior Court* (2017) 3 Cal.5th 531, 546 ["PAGA was intended to advance the state's public policy of affording employees workplaces free of Labor Code violations, notwithstanding the inability of state agencies to monitor every employer or industry"].)

Allowing courts to dismiss PAGA claims based on manageability would interfere with PAGA's express design as a law enforcement mechanism.  The LWDA is not subject to a manageability requirement when it investigates Labor Code violations and assesses fines internally.  (*Zackaria*, *supra*, 142 F.Supp.3d at pp. 958-959.)  And "where the LWDA has discretion to assess a civil penalty, the courts are to exercise the *same discretion*, subject to *the same limitations and conditions* as the LWDA."  (*LaFace*, *supra*, __ Cal.App.5th __, __ [2022 WL 498847, at p. *7]; § 2699, subd. (e)(1).)

Imposing a manageability requirement would create an extra hurdle in PAGA cases that does not apply to LWDA enforcement actions. This would undermine PAGA's purpose as an "administrative enforcement action conducted in court on behalf of the state by an aggrieved employee." (See *LaFace*, at p. *5; *Williams v. Superior Court*, *supra*, 3 Cal.5th at p. 548 ["Hurdles that impede the effective prosecution of representative PAGA actions undermine the Legislature's objectives"].)

We understand the concerns expressed in *Wesson*. Some PAGA claims involve hundreds or thousands of alleged aggrieved employees, each with unique factual circumstances. We do not intend our ruling to mean that in such scenarios, a court must allow for each of these alleged aggrieved employees to be examined at trial. Such a scenario would be unduly expensive, impractical, and place far too great a burden on our already busy trial courts. Rather, courts may, where appropriate and within reason, limit witness testimony and other forms of evidence when determining the number of violations that occurred and the amount of penalties to assess. (See Code Civ. Proc., § 128, subd. (a)(3) & (8); § 2699, subds. (a), (f) & (g); see also *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1351-1352.) Consequently, in cases with individualized circumstances and vast numbers of alleged aggrieved employees, PAGA plaintiffs may have difficulty proving purported violations suffered by other employees. "At trial, plaintiff may prove that defendant violated the California Labor Code with respect to the employees it describes as 'aggrieved employees,' some of the employees, or he may not prove any violations at all. But the fact that proving his claim may be difficult or even somewhat burdensome for himself and for defendant does not mean that he cannot bring it at all." (*Zackaria*, *supra*, 142 F.Supp.3d at pp. 959-960.)

This approach may also encourage plaintiffs' counsel to be prudent in their approach to PAGA claims and to ensure they can efficiently prove alleged violations to unrepresented employees. We encourage counsel to work with the trial courts during trial planning to define a workable group or groups of aggrieved employees for which

24

violations can more easily be shown.[8]  If PAGA plaintiffs are unable to do so, they risk being awarded a paltry sum of penalties, if any.  Such an outcome is not unfair to the unrepresented aggrieved employees.  Unlike a class action, "absent employees do not own a personal claim for PAGA civil penalties [citation], and whatever personal claims the absent employees might have for relief are not at stake [citations]."  (*Williams v. Superior Court*, *supra*, 3 Cal.5th at p. 547, fn. 4.)  Rather, the civil penalties awarded under PAGA are "'intended to punish the wrongdoer and to deter future misconduct.'"  (*Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667, 681.)  If a plaintiff alleges widespread violations of the Labor Code by an employer in a PAGA action but cannot prove them in an efficient manner, it does not seem unreasonable for the punishment assessed to be minimal.

Since we reverse the trial court's ruling dismissing the PAGA claims as unmanageable, we need not address Royalty's argument that the court erred by awarding PAGA penalties to Dyer/Derian plaintiffs in their individual capacity.  On remand, we direct the court to hold a new trial on this portion of the PAGA claim.  Prior to trial, we direct the parties and court to discuss whether the pool of alleged aggrieved employees should be narrowed or divided to effectively prove the alleged violations at trial.  We also leave it in the trial court's discretion to determine whether additional evidence, including new witnesses, is necessary to determine the extent of the Labor Code violations alleged.  As alluded to above, if plaintiffs are unable to show widespread violations affecting unrepresented employees in a reasonable manner, the court shall award penalties to the aggrieved employees to the extent of plaintiffs' proof.

---

[8]  For example, narrowing alleged violations to employees at a single location or department.

*C. Statute of limitations for the Porterville Meal Period Claim*

The Porterville class's meal period claim was based on Porterville's on-premises meal policy. Plaintiffs first alleged this policy and the related claims in the TAC. The court ruled these allegations did not relate back to any prior pleading and applied a four-year statute of limitations on this claim to the TAC's filing date (November 17, 2016). It reasoned the SAC only included "two named plaintiffs, both of whom worked [at Dyer and Derian]." And while these two plaintiffs "could raise issues common to Porterville like missed or late meal periods or rest violations, they could not" assert claims based on the on-premises meal policy because it was unique to Porterville. Based on this finding, the court restricted recovery on this claim to violations occurring at Porterville between November 17, 2012, and June 14, 2017.

On appeal, plaintiffs contend the Porterville meal period claim relates back to the SAC, filed on October 22, 2014, which would allow recovery for meal period violations at Porterville occurring between October 22, 2010, and June 14, 2017. We agree with plaintiffs and direct the court on remand to recalculate the amount of premium pay owed to the Porterville class for meal period violations based on this earlier date.[9]

*1. Applicable law*

"An amended complaint is considered a new action for purposes of the statute of limitations only if the claims do not 'relate back' to an earlier, timely filed complaint. Under the relation-back doctrine, an amendment relates back to the original complaint if the amendment: (1) rests on the same general set of facts; (2) involves the same injury; and (3) refers to the same instrumentality. [Citations.] An amended complaint relates back to an earlier complaint if it is based on the same general set of facts, even if the plaintiff alleges a different legal theory or new cause of action.

---

[9] Because of this finding, we do not consider plaintiffs' argument that the SAC tolled the statute of limitations for this claim.

26

[Citations.] However, the doctrine will not apply if the 'the plaintiff seeks by amendment to recover upon a set of facts entirely unrelated to those pleaded in the original complaint.'" (*Pointe San Diego Residential Community, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP* (2011) 195 Cal.App.4th 265, 276-277 (*Pointe San Diego*).) Similarly, "an amended pleading that adds a new plaintiff will not relate back to the filing of the original complaint if the new party seeks to enforce an independent right or to impose greater liability against the defendants." (*San Diego Gas & Electric Co. v. Superior Court* (2007) 146 Cal.App.4th 1545, 1550.)

The primary consideration when applying the relation back doctrine is whether the prior complaint provided the defendant with sufficient notice of the claim in the amended complaint. (*Pointe San Diego*, *supra*, 195 Cal.App.4th at p. 279.) This is due to the purpose behind statutes of limitation. They are intended to provide defendants with adequate notice of claims, so they have sufficient time to prepare a defense. This purpose is met when a new claim is based on the same facts as a prior complaint. (*Scholes v. Lambirth Trucking Co.* (2017) 10 Cal.App.5th 590, 599.) Along with this consideration, though, courts should keep in mind our state's strong policy of deciding cases on their merits. (*Pointe San Diego*, at p. 277.)

Generally, courts have liberally applied the relation-back doctrine. For example, in *Barnes v. Wilson* (1974) 40 Cal.App.3d 199 (*Barnes*), the decedent was the victim of a stabbing in the Golden Gloves Tavern. His heirs sued the owners of the Golden Gloves Tavern, alleging they "negligently failed to warn patrons of the unreasonable risk created by the presence of the assailant and negligently failed to provide protection for their patrons." (*Id.* at p. 201.) The heirs later amended their complaint to substitute in as doe defendants the owners of a neighboring tavern, the Copper Door Tavern. The heirs alleged the Copper Door Tavern owners negligently continued to serve the assailant alcoholic beverages when it was clear he was

27

"excessively intoxicated" and after he had already "brandished a knife and constituted a danger to himself and to others." (*Id*. at p. 202.)

The appellate court found the negligence claims against the Copper Door Tavern owners related back to the initial complaint against the owners of the Golden Gloves Tavern. (*Barnes*, *supra*, 40 Cal.App.3d at pp. 202-203, 206.) The amended complaint sought "to hold the [Copper Door Tavern owners] responsible for the same occurrence and damage alleged in the original complaint." (*Id*. at p. 205.) Although "the original complaint did not contain an allegation that the assailant was intoxicated. . . . The allegation of excessive intoxication in the amended complaint merely added an incidental fact reasonably inferable from the facts alleged in the original complaint and did not result in a statement of 'a significantly distinct cause of action.'" (*Ibid*.)

In *Idding v. North Bay Construction Co.* (1995) 39 Cal.App.4th 1111 (*Idding*), plaintiff filed a negligence claim arising from injuries sustained in a fall while working at a project in Stockton. After the statute of limitations expired, he amended his complaint and alleged he was injured in a completely different project in Napa. (*Id*. at pp. 1112-1113.) Despite this change, the court found the amended complaint related back to the original. It reasoned, the "amended complaint, by seeking recovery for the same accident and injuries as the original complaint, but merely changing the situs of the accident," arose from "the same 'general set of facts.'" (*Id*. at p. 1114.)

In *Pointe San Diego*, plaintiffs filed a form complaint against their former attorney alleging professional negligence. They checked a box marked "General Negligence" on the form and "included an attachment alleging defendants were the 'legal (proximate) cause of damages to plaintiff[s]' and '[b]y the following acts or omissions to act, defendant negligently caused the damage to plaintiff.'" In a section for describing the reasons for liability, plaintiffs stated that "'Defendant[], as Plaintiffs' attorneys, failed to use due care in the handling of [certain] litigation.'" (*Pointe San Diego*, *supra*, 195

28

Cal.App.4th at p. 277.) Plaintiffs later amended the complaint to add more details about the nature of the alleged negligence. (*Id*. at pp. 272-273.)

The court found the new allegations in the amended complaint related back to the general allegations in the initial form complaint. Because the initial complaint clearly alleged the matter in which the defendant had represented the plaintiff, the defendant "was put on notice that the professional negligence claim was based on its representation of plaintiffs in this case, and of the need to gather and preserve evidence relating to this representation." (*Id*. at p. 278.) "Although the original complaint did not detail *how* the firm had allegedly breached the standard of care, the form complaint and the . . . amended complaint rested on the same general set of facts ([defendant's] prosecution of the [prior] litigation), involved the same injury (monetary damages sustained as a result of alleged professional negligence), and referred to the same instrumentality (alleged professional negligence)." (*Ibid*.)

In contrast to these cases, Royalty cites *McCauley v. Howard Jarvis Taxpayers Assn.* (1998) 68 Cal.App.4th 1255, in which the plaintiff filed a complaint against the defendant for violating reporting requirements governing political campaigns. The plaintiff's claim was based on a single violation: the defendant's failure to report financial information for a specific committee it had formed relating to a 1984 ballot proposition. Years later, the plaintiff filed an amended complaint that added different reporting law violations relating to a proposition on the 1986 ballot. (*Id*. at pp. 1258-1259.) The court found these new allegations did not relate back because each reporting violation was a discrete event, not part of a continuing violation. (*Id*. at pp. 1262-1263.) "[D]ifferent acts leading to distinct injuries are *not* part of the 'same general set of facts.'" (*Id*. at p. 1262.)

*2. Analysis*

Since plaintiffs' argument involves the application of law to undisputed facts, our review is de novo. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) We begin by comparing the allegations in the two complaints.

Though the named plaintiffs in the SAC were from Dyer and Derian, their proposed class covered Porterville employees. It included "[a]ll current and former nonexempt employees of [Royalty] who worked in its carpet manufacturing and warehouse facilities in California at any time from December 13, 2009, through the date of judgment." The SAC identified Porterville as one of these facilities. With regard to the class's meal period claims, the SAC generally alleged Royalty "[f]ail[ed] to provide employees with timely *and proper meal periods*, and fail[ed] to pay employees an hour of pay for failing to provide such meal periods . . . ." (Italics added.) Likewise, the SAC alleged a common question of law involved "[w]hether Royalty . . . failed to provide timely *and proper meal periods* to employees, or pay premium wages, in lieu of providing such periods." (Italics added.) The SAC also contained more specific descriptions of the meal period violations: "[Royalty] did not timely provide many employees with either their first or second 30-minute 'duty free' meal periods for a substantial number of days, and did not pay its employees the additional hour of premium wages for each workday the meal periods were not provided."

The proposed class in the TAC was substantially the same as the SAC. The TAC also contained similar general allegations regarding the meal period violations, such as, "Royalty had a company-wide policy and practice of . . . failing to provide employees with timely *and proper meal periods* and rest periods, and failing to pay employees premium pay when they were not provided such meal and rest periods." (Italics added.) It also contained more specific allegations that Royalty failed to provide employees with timely first and second meal periods. But the TAC added new allegations about Porterville's on-premises meal policy. For example, it alleged that "[a]t Porterville,

30

Royalty also had a long standing policy of requiring employees to take their meal periods in the company lunch room. . . . This prevented employees from leaving the facility to take their meal periods." In the TAC, plaintiffs sought premium pay for Porterville workers based on this allegedly unlawful policy.

Based on these allegations, this case has more in common with *Barnes*, *Idding*, and *Pointe San Diego* than *McCauley*. The amended complaints in *Barnes*, *Idding*, and *Pointe San Diego* added related facts that expanded upon the core facts of the initial complaint or corrected information from the initial complaint. Crucially, though, these new allegations were still grounded in the same accident, injury, and instrumentality. In *Barnes*, the allegations regarding negligent service of alcohol to the assailant all pertained to the victim's death caused by the assailant's stabbing. In *Idding*, although the plaintiff identified the wrong project in his initial complaint, his amended complaint still sought relief for the same incident: a fall sustained at a worksite. Finally, in *Pointe San Diego*, the amended complaint related back because it only added more details concerning the malpractice that was broadly alleged in the initial complaint.

Like these cases, the Porterville meal period claim alleged in the TAC is based in same facts, injury, and instrumentality as the SAC's meal period claims: Royalty failed to provide its employees at Dyer, Derian, and Porterville with proper meal periods and failed to provide premium pay under section § 226.7. The exact nature of the noncompliant meal periods at Dyer and Derian (untimely meal periods) was different than Porterville (on-premises meals). But these two theories are still grounded in plaintiffs' overall allegations that Royalty was not providing its employees at the three facilities with compliant meal periods and was not providing premium pay over the same period. Consequently, adding allegations about Porterville's on-premises meal policy in the TAC was akin to the incidental details added in *Barnes* and *Pointe San Diego* or the correction of the worksite in *Idding*. Unlike *McCauley*, the new allegations in the TAC were not discrete violations. Rather, they built upon the allegations in the SAC that

31

Royalty "[f]ail[ed] to provide employees with timely and proper meal periods, and fail[ed] to pay employees an hour of pay for failing to provide such meal periods . . . ."

Further, the SAC provided sufficient notice to Royalty of the on-premises meal policy claims in the TAC. The SAC put Royalty on notice that plaintiffs were seeking premium pay for Dyer, Derian, and Porterville employees based on noncompliant meal periods. While the SAC also specified Royalty's meal periods were noncompliant because they were untimely, it did not state this was the only way meal periods had been noncompliant. There was sufficient information in the SAC "to permit [Royalty] to gather and preserve the relevant materials and begin to conduct discovery and prepare a defense to the claims that were later refined and augmented in the amended complaints." (*Pointe San Diego*, *supra*, 195 Cal.App.4th at p. 278.) Based on the SAC, Royalty "could have . . . engaged in discovery to seek information about the exact factual basis for the . . . claim." (*Id.* at p. 279.)

Royalty also argues the SAC had no valid class representative for a claim based on the on-premises meal policy, since neither of the SAC's named plaintiffs worked at Porterville. However, "if the cause of action alleged against the defendant would not be wholly different after amendment, a complaint filed by a party without standing may be amended to substitute in the real party in interest." (*CashCall, Inc. v. Superior Court* (2008) 159 Cal.App.4th 273, 287-288.) "'[A]n amendment to substitute in the real party in interest is entitled to relation-back effect. The effect of plaintiff's lack of standing . . . [is] simply that plaintiff need[s] to amend [the complaint to substitute in a real party in interest as plaintiff].' [Citations.] Therefore, '[i]n general, courts liberally allow amendments for the purpose of permitting plaintiffs who lack or have lost standing to substitute as plaintiffs the true real parties in interest.'" (*Ibid.*, italics omitted.) Since the on-premises meal policy claim in the TAC relates back to the SAC, it was permissible for plaintiffs to amend the SAC and add Porterville employees with standing to bring it.

32

*D. Decertification of the Dyer/Derian Meal Period Subclass*

　　　*1. The trial court's ruling*

Initially, the trial court certified subclasses for the Dyer/Derian meal period claims, stating there were common issues as to whether plaintiffs were "provided timely first meal periods" and/or "deprived of second meal periods." But following the presentation of evidence at trial, the court decertified these subclasses, finding too many individualized issues to support class treatment.[10] Plaintiffs argue this decision must be reversed. We agree. When the trial court made its ruling, it did not have the benefit of *Donohue*, which established a rebuttable presumption affecting the burden of proof on these claims. (*Donohue*, *supra*, 11 Cal.5th at p. 61.) We reverse the court's decertification order and remand this case so these claims may be retried in light of the *Donohue* presumption.

"The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'" (*Brinker*, *supra*, 53 Cal.4th at p. 1021.) "In an exception to a customary rule of appellate practice, we review the court's rationale for its order. (The customary rule is to review the result of the court's order, *not* its rationale.) [Citations.] We thus review only the reasons the court stated for its order, and we reverse

---

[10] Though the court's initial certification order created a single meal period subclass, the court's decertification order appears to treat the first and second meal period issues as two separate subclasses. Thus, we also treat these issues as separate subclasses.

if those reasons do not support the order." (*Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1361.)

Here, the court's decertification order was based on a finding that the Dyer/Derian meal period claims involved too many individualized issues, i.e., the claims lacked predominant common questions. Central to the court's analysis was its belief that employee choice was a significant factor with respect to late and missed meal breaks. As to the late first meal periods, it found "[t]he evidence submitted at trial showed wide variations among different departments, shifts, and job positions regarding the timing of first meal breaks." The court noted that "[p]laintiffs' position is that despite those wide variations, every time an employee took a late meal it was because Royalty would not allow the employee to take a timely meal but insisted that the employee be relieved by another employee or finish their work before taking the meal." But the court credited evidence showing "various employees did not need to be relieved or finish their work in order to take a meal break" and concluded that employee choice was a significant factor leading to late meal breaks. "The issue of employee choice compels the conclusion that different departments, job positions, and/or shifts, and the various work duties/needs of those different departments, job positions, and/or shifts, handled meal breaks differently. [T]hese realities cut against class treatment . . . ."

As to the missed second meal periods, the court explained, "[t]he evidence shows that employee choice was a significant factor with respect to taking second meal breaks, and that some employees wanted to skip second meal breaks so that they could leave earlier at the end of the day. By illustration, 30 percent of the workdays over 10 hours did not exceed 10 hours and 15 minutes. Accordingly, the second meal break subclass presents too many individualized issues to support class treatment."

Where a certification ruling is based on predominance of common questions, "the 'ultimate question' . . . is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or

34

substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] 'The answer hinges on "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." [Citation.] . . . "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." [Citations.]' However, . . . class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment"' on common issues." (*Duran v. U.S. Bank National Assn.*, *supra*, 59 Cal.4th at p. 28.) In other words, "[t]he granting of class certification . . . requires a determination that group, rather than individual, issues predominate." (*Ibid.*)

The court's decertification order is reviewed for an abuse of discretion. (*Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 942, fn. 16.) It "'generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.'" (*Brinker*, *supra*, 53 Cal.4th at p.1022.) As to the latter two grounds, "'"[a]ll exercises of discretion must be guided by applicable legal principles . . . . [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is

subject to reversal."'''" (*Kramer v. Traditional Escrow, Inc.* (2020) 56 Cal.App.5th 13, 27.)

        *2. Analysis*

        In the wage and hour context, a class may establish commonality by showing a uniform policy or practice that causes members to miss or take late meal breaks. (See *Brinker*, *supra*, 53 Cal.4th at pp. 1051-1052; *Lampe v. Queen of the Valley Medical Center*, *supra*, 19 Cal.App.5th at pp. 848-849.) Here, Royalty's employee handbook during the relevant time period contained a lawful policy for scheduling first meal periods: "[Royalty] will provide you a thirty minute (30) meal period if you work more than five (5) hours in a workday. . . . Your supervisor will schedule your meal period approximately between the 3rd and 5th hour of work." Likewise, the handbook stated it was Royalty's policy to provide second meal breaks: "[Royalty] will provide you a second meal period of thirty minutes (30) if you work more than ten (10) hours in a workday." Nonetheless, "the mere existence of a lawful break policy will not defeat class certification in the face of actual contravening policies and practices that, as a practical matter, undermine the written policy and do not permit breaks." (*Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 406-407.)

        Faced with Royalty's written policies, plaintiffs' theory of liability at trial centered around informal policy. They argued supervisors at Royalty controlled meal period decisions and scheduled late first meal periods and failed to provide second meal periods. In particular, plaintiffs claimed violations occurred based on an informal policy requiring employees to finish their work or be relieved by another employee prior to taking meal breaks. They supported their theory with evidence of violation rates derived from timekeeping records. Prior to the filing of this lawsuit in December 2013, there were late first meal violation rates of 69 and 70 percent at Dyer and Derian, respectively. After this lawsuit was filed, these violation rates dropped to 11 percent at Dyer and 7

36

percent at Derian. Plaintiffs assert this sudden drop is evidence of employer control. As for second meal periods, they were unrecorded 98 percent of the time at Dyer and 99.6 percent of the time at Derian. These rates remained the same after this lawsuit was filed.

After the trial court entered judgment in this case, our Supreme Court decided *Donohue*, which discussed the use of timekeeping records in wage and hour class actions. It held that "[i]f time records show missed, short, or delayed meal periods with no indication" that premium pay was provided, then a rebuttable presumption arises that the employee was not provided a compliant meal period. (*Donohue*, *supra*, 11 Cal.5th at p. 77; *id*. at p. 74.) "The presumption derives from an employer's duty to maintain accurate records of meal periods." (*Id*. at p. 76.) "'To place the burden elsewhere would offer an employer an incentive to avoid its recording duty and a potential windfall from the failure to record meal periods.' [Citation.] ""[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee."""" (*Ibid*.) "Employers can rebut the presumption by presenting evidence that employees . . . had in fact been provided compliant meal periods during which they chose to work. 'Representative testimony, surveys, and statistical analysis,' along with other types of evidence, 'are available as tools to render manageable determinations of the extent of liability.'" (*Id*. at p. 77.)

The *Donohue* presumption is not entirely new. It can be traced back to *Brinker*, in which Justice Werdegar provided a concurring opinion rejecting the employer-defendant's argument "that the question why a meal period was missed renders meal period claims *categorically* uncertifiable." (*Brinker*, *supra*, 53 Cal.4th at p. 1052 (conc. opn. of Werdegar, J.).) Justice Werdegar explained, "such a per se bar would be inconsistent with the law governing reporting obligations and our historic endorsement of a variety of methods that render collective actions judicially manageable." (*Ibid*.) Rather, "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal

period was provided. . . . An employer's assertion that it did relieve the employee of duty, but the employee waived the opportunity to have a work-free break, is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief." (*Id.* at pp. 1052-1053.)

*Donohue* expressly adopted Justice Werdegar's concurrence and explained "the presumption goes to the question of liability and applies at the summary judgment stage, not just at the class certification stage." (*Donohue*, *supra*, 11 Cal.5th at pp. 75-76.) Royalty reads *Donohue* narrowly and maintains the presumption only applies at these two stages of an action. We disagree. Significantly, nothing in *Donohue* expressly limits the application of the presumption to these stages. And given that it affects liability (*ibid*; see *id*. at p. 78), we see no reason why the presumption would not apply at trial. Further, the wording of the court's holding suggests the presumption applies beyond summary judgment and class certification: "[W]e hold that time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations, *including at the summary judgment stage*." (*Id*. at p. 61, italics added.) It can be inferred from the broad language used in the initial portion of the sentence that the presumption affects all stages of a case after it is raised. The italicized language contained in the latter portion of the sentence denotes *Donohue* only sought to clarify that this includes summary judgment.

Prior to *Donohue*, Justice Werdegar's concurrence had been cited by several appellate courts. (*Donohue*, *supra*, 11 Cal.5th at p. 75 [listing cases].) But it does not appear the trial court applied the presumption here. While the court acknowledged the presumption at the hearing on Royalty's mid-trial decertification motion, its decertification order does not mention it. More so, the order states the meal period subclasses were being decertified because "*Plaintiffs fail[ed]* to satisfy their burden to establish commonality or predominance." (Italics added.) But, under *Donohue*, plaintiffs met their burden by presenting the time record evidence cited above. Based on that evidence, the court should have presumed Royalty's liability in providing late first meal

38

periods and failing to provide second meal periods. The burden would then have shifted to Royalty to show that plaintiffs were provided with compliant meal periods but chose to work instead. (*Id*. at p. 78; see *Brinker*, *supra*, 53 Cal.4th at pp. 1052-1054 (conc. opn. of Werdegar, J.).) It then follows that the burden would have been on Royalty, not plaintiffs, to show individual issues predominated. Thus, following *Donohue*, the court's decertification order relies on erroneous legal assumptions and is subject to reversal.

Further, this error was prejudicial. "An error is prejudicial . . . if the reviewing court concludes, based on its review of the entire record, that it is reasonably probable that the trial court would have reached a result more favorable to the appellant absent the error." (*Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 999.) Significantly, "''[r]easonable probability'" means 'merely a reasonable chance, more than an abstract possibility,' a '"probability sufficient to undermine confidence in the outcome."'" (*Haytasingh v. City of San Diego* (2021) 66 Cal.App.5th 429, 467-468.) And unlike substantial evidence review, we consider the weight of the evidence when determining whether the error was prejudicial. (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1024, fn. 6.)

Though Royalty was required to put on its defense, as stated in the decertification order, the trial court's ruling was driven by *plaintiffs*' failure to establish commonality or predominance. This conclusion was primarily driven by the court's finding that employee choice led to a significant amount of late or missed meal breaks. But the court may have ruled differently had its analysis started from the presumption that Royalty was liable for these meal period violations and had the burden of showing otherwise. Based on the record, this case was close enough that there is a reasonable likelihood the failure to shift the burden affected the outcome.

For example, one of plaintiffs' theories at trial was that first meal periods were taken late because Royalty required workers to be relieved or finish their work prior to taking meal breaks. The court rejected it, finding "various employees did not need to

be relieved or finish their work in order to take a meal break, and that employee choice was a significant factor with respect to taking meal breaks." It appears this finding was materially influenced by the testimony of five employees, four of which were named plaintiffs. In particular, the court focused on inconsistent testimony given by several of these witnesses.[11] In addressing the evidence relevant to plaintiffs' theory above, the court observed one of plaintiffs' witnesses "first . . . said she had to be relieved to take a meal break. Then she said she didn't take a meal break after working five hours in a day. Then she said the opposite, that she did get meal breaks like three times a week. So she changed her testimony. On a dime." Likewise, the court noted another of plaintiffs' witnesses "gave three different answers right in a row on this topic regarding how often" his manager told him he could not take lunch before finishing his work. It also highlighted another witness's testimony that his "supervisor did not tell him when to take meal break. Took meal break after five hours. Not his decision; supervisor's. So that sounds like changing his testimony relatively quickly."

That the court spent significant time pointing out this inconsistent testimony causes us to believe it was a material factor in the court's finding that employee choice created too many individualized issues. Once the *Donohue* presumption was raised, though, plaintiffs no longer had the burden of proving a theory of class liability. Rather, it would have been presumed from the time records that Royalty had provided untimely meal periods to its employees and was liable for those violations. (*Donohue*, *supra*, 11 Cal.5th at pp. 74, 77.) Put differently, class liability would be presumed. The burden would then be on Royalty to show it gave employees compliant meal breaks that were voluntarily not taken. In this scenario, we are not reasonably

---

[11] The five witnesses were Octavio Molina Chavez and Dyer/Derian plaintiffs Paulina Nava Medina, Martin Garcia, Jose Garcia, and Juan Ortiz Lopez. Many of the witnesses at trial, including these five, required interpreters, which may have contributed to the inconsistent testimony.

40

certain the conflicting testimony of five employees, from a class of 215 employees, would still have led the court to conclude that employee choice was a significant factor and created too many individualized issues. Rather, there is a reasonable probability the court would have reached a different result based on this evidence. Our confidence in the court's ruling is sufficiently undermined to find prejudice.

Similarly, as to the missed second meal period claims, the court's ruling was based on evidence that some employees wanted to skip second meal breaks so they could leave earlier in the day. But, again, this ruling was based on the erroneous belief that plaintiffs had the burden of showing second meal breaks were not given and establishing a theory of class liability. Instead, it was Royalty's burden to show it provided second meal periods and that a material number of employees chose to skip them.

At trial, there was some evidence directly showing employees voluntarily chose to skip second meal breaks, but it was not entirely persuasive. Royalty had waivers signed by three different employees – Juan Martinez, Agustin Mendoza, and Alberto Ventura. But one of these employees, Ventura, had previously submitted a declaration indicating his waiver was involuntary: "if my co-workers and I worked more than 10 hours in a day, [our supervisors] . . . require[d] us to sign a document stating that we waived our second meal break."

Royalty also called two employees to testify at trial. One witness said he was unaware of his right to a second meal break. The other witness, a lead employee, testified he waived his second meal break so he could leave early, and he also stated an indefinite number of employees sometimes told him they wanted to skip their second meal break. But this same employee also testified he was unaware of employees' right to a second meal break for a substantial portion of the class period:

"Q: During the period of December 2009 to November 2013, did you sometimes work shifts that lasted more than 10 hours?

41

"A: Yes.

"Q: And on those occasions, is it correct that you understood you had a right to take a second meal break?

"A: No."

This lead employee had also previously submitted a declaration signed in June 2015, stating that "[employees] were informed that we have a right to a second meal break, but I independently decided to waive the second meal break." At trial, however, he disclosed Royalty had only begun informing employees of their right to a second meal break at the time he signed the declaration, i.e., around June 2015. He also revealed his declaration had been prepared by an attorney and that he signed it "[f]or fear of having retaliation and fear of losing my job."

Had the court applied the presumption, the burden would have been on Royalty to show a significant number of employees voluntarily chose to skip their meal breaks, creating individualized issues of liability. Based on Royalty's above evidence, we are not reasonably certain the court would have still ruled in favor of Royalty had the burden been shifted. It is true the court also inferred a significant number of employees voluntarily chose to skip second meal periods based on data showing 30 percent of the relevant workdays were only between 10 hours and 10 hours and 15 minutes long. But it appears this inference was at least partially influenced by the aforementioned anecdotal evidence from witnesses. And even if it was not, it is unclear how much of the court's ruling was based on witness testimony versus statistical data. Besides, employees cannot voluntarily skip second meal periods if they are unaware of their legal right to take them. Accordingly, we conclude there is a reasonable chance the court would have reached a different result had the presumption been applied.

For the above reasons, we reverse the trial court's decision to decertify the Dyer/Derian meal period subclasses. On remand, we direct the trial court to apply the

*Donohue* presumption and hold a new trial in light of this opinion to determine whether class liability is appropriate on these claims and, if so, the amount of defendant's liability.

*E.  Prejudgment Interest Rate*

The trial court awarded premium pay under section 226.7 for meal period violations to the Porterville class.  It granted prejudgment interest on these sums at a rate of seven percent, but plaintiffs maintain a 10 percent rate should have been applied.  The court used the correct rate.[12]

"The primary purpose of an award of prejudgment interest is to compensate the plaintiff for the loss of use of money during the period before the entry of judgment, in order to make the plaintiff whole.  [Citations.]  Absent a statutory provision specifically governing the type of claim at issue, the prejudgment interest rate is 7 percent . . . ." (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 573.)  Plaintiffs believe section 218.6 applies here, which states "*[i]n any action brought for the nonpayment of wages*, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code . . . ." (Italics added.)  Under Civil Code section 3289, subdivision (b), a 10 percent prejudgment interest rate is applied in breach of contract cases in which the contract does not contain a governing provision.

The resolution of this issue turns on whether plaintiffs' claim for premium pay under section 226.7 is "an action brought for the nonpayment of wages," as required by section 218.6.  It is not.  While our Supreme Court has held that premium pay is a wage and not a penalty, it has clarified "a section 226.7 claim is not an action brought for nonpayment of wages; it is an action brought for nonprovision of meal or rest breaks."

---

[12]  Plaintiffs also assert the court applied the incorrect interest rate to the individual premium pay awards granted to the named Dyer/Derian plaintiffs for their meal period claims.  Given our reversal of the court's decertification order, however, these individual awards are also reversed.

(*Kirby v. Immoos Fire Protection, Inc.*, *supra*, 53 Cal.4th at pp. 1256-1257.) "Nonpayment of wages is not the gravamen of a section 226.7 violation. Instead, subdivision (a) of section 226.7 defines a legal violation solely by reference to an employer's obligation to provide meal and rest breaks. [Citation.] The 'additional hour of pay' provided for in subdivision (b) is the legal remedy for a violation of subdivision (a), but whether or not it has been paid is irrelevant to whether section 226.7 was violated." (*Ibid*.) Rather, it is "[t]he failure to provide required meal and rest breaks [that] triggers a violation of section 226.7." (*Ibid*.)

Citing *Bell v. Farmers Ins. Exchange* (2006) 135 Cal.App.4th 1138, plaintiffs also appear to suggest that if section 218.6 is inapplicable, a 10 percent rate should be applied under Civil Code section 3289, subdivision (b). In *Bell*, the trial court awarded a class over $90 million in unpaid overtime compensation plus 10 percent prejudgment interest under Civil Code section 3289. (*Bell*, at p. 1141.) The defendant claimed this rate was incorrect because the 10 percent rate was first authorized by section 218.6, which had gone into effect shortly before judgment was entered. It sought to apply a seven percent interest rate to the period before the effective date of section 218.6, and a 10 percent rate to the period after. (*Bell*, at p. 1142.) The appellate court disagreed and affirmed the trial court, finding section 218.6 merely clarified existing law: "Before section 218.6 expressly required the use of the breach-of-contract rate for prejudgment interest, this rate was still the appropriate rate for *unpaid wage claims* [under Civil Code section 3289] because of the contractual nature of the employment relationship." (*Ibid.*, italics added.)

We are unpersuaded by *Bell*, which merely clarified that claims for *unpaid wages* were already subject to a prejudgment interest rate of 10 percent under Civil Code section 3289, subdivision (b), prior to the effective date of section 218.6. We do not read *Bell* to imbue Civil Code section 3289, subdivision (b) with more expansive rights than section 218.6 in the context of this lawsuit. Since plaintiffs are not entitled to 10 percent

44

interest under section 218.6, they are not entitled to it under Civil Code section 3289, subdivision (b).

## F. Derivative Penalties for Porterville Employees

### 1. Waiting time penalties

"'If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.'" (*Kao v. Holiday* (2017) 12 Cal.App.5th 947, 962.) As explained by *Kao*, under section 203, subdivision (a), "'[i]f an employer *willfully* fails to pay . . . any wages of an employee who is discharged . . . , the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.' [Citation.] 'The plain purpose of . . . sections 201 and 203 is to compel the immediate payment of earned wages upon a discharge.'" (*Ibid*, italics added.) Because Royalty failed to provide premium pay to Porterville employees for meal break violations when they were separated from employment, plaintiffs believe the Porterville class is owed waiting time penalties under section 203. Not so.

It is currently unclear whether an employee can pursue derivative waiting time penalties based on an employer's failure to provide premium pay at separation. In *Naranjo v. Spectrum Security Services, Inc.* (2019) 40 Cal.App.5th 444, 474, the Second District held that regardless of willfulness, "section 226.7 actions do not entitle employees to pursue the derivative penalties in section[] 203." This holding was based on the *Naranjo* court's interpretation of the meaning of "wages" within section 203, which was based on the definitions of "wages" and "labor" provided in section 200, subdivisions (a) and (b).[13] (*Naranjo*, at pp. 473-474.) *Naranjo* is currently under review.

---

[13] *Naranjo* similarly found employees could not pursue derivative wage statement penalties (§ 226, subd. (e)(1)), based on section 226.7 actions for premium pay. (*Naranjo v. Spectrum Security Services, Inc.*, *supra*, 40 Cal.App.5th at p. 474.)

(*Naranjo v. Spectrum Security Services* (Jan. 2, 2020, S258966) __Cal.5th __, __.) Plaintiffs appear to believe our Supreme Court's impending decision in *Naranjo* will be dispositive here. Addressing *Naranjo's* analysis, they argue premium pay under section 226.7 constitutes wages earned under section 203, entitling them to premium pay. But we need not address *Naranjo*. Here, even if premium pay is a wage under section 203, no violation occurred because Royalty's failure to provide premium pay was not willful.

"A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." (Cal. Code Regs., tit. 8, § 13520.) "A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.'" (Cal. Code Regs., tit. 8, § 13520, subd. (a).) An objective standard is applied. (*Maldonado v. Epsilon Plastics, Inc.* (2018) 22 Cal.App.5th 1308, 1332.)

As set forth above in discussion part II.A.3. regarding the settlement releases, there was a good faith dispute as to whether Royalty's on-premises meal policy was lawful and whether Porterville employees were owed premium pay based on this policy. Therefore, Royalty's failure to provide premium pay to Porterville employees upon separation was not willful, and it is not liable for any derivative waiting time penalties.

46

## 2. *Wage statement penalties*

Under section 226, subdivision (a), employers must furnish employees with accurate itemized wage statements showing, among other things, all gross and net wages earned. "An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees." (§ 226, subd. (e)(1).)

Plaintiffs' derivative wage statement claim is again based on Royalty's on-premises meal policy. They contend the Porterville class's wage statements failed to reflect the premium pay they were owed due to this unlawful policy. The trial court denied this claim under *Maldonado v. Epsilon Plastics. Inc.*, *supra*, 22 Cal.App.5th 1308. As described by the trial court, *Maldonado* "held that no wage statement penalties should be imposed for statements that accurately reflect the basis for the particular paycheck. Plaintiffs admitted that their wage statement claim was a derivative one, conceding that although the statements accurately showed what defendant's employees were paid, the wage statements were allegedly inaccurate only because they should have included additional pay. The *Maldonado* court rejected this argument, and that holding applies here."

Plaintiffs fail to meet their "burden to affirmatively show error. [Citation.] To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Plaintiffs do not discuss the court's analysis of their wage statement claim. They fail to even cite *Maldonado* in their briefs. Rather, they insist premium pay under section 226.7 is wages earned under section 226, subdivision (a), and should have been included on the wage statements of Porterville

47

employees. But this argument does not address the court's ruling, which found no liability based on plaintiffs' concession that their wage statements accurately reflected what they were actually paid.

In fact, Royalty's respondent's brief highlighted plaintiffs' failure to discuss the court's reasoning in their opening brief. Plaintiffs' reply brief did not just ignore this contention, it failed to include any argument on the wage statement claim. Since plaintiffs have made no attempt to show any error in the court's analysis, their "brief effectively asks the appellate court to become [their] lawyer. A court cannot fairly embrace this partisan role." (*Singman v. IMDB.com, Inc.* (2021) 72 Cal.App.5th 1150, 1151.)

III

DISPOSITION

We reverse the trial court's order decertifying the Dyer/Derian meal period subclasses and dismissing the portion of the Dyer/Derian PAGA claim based on meal period violations. On remand, the court shall hold a new trial on both claims. As to both, we leave it in the court's discretion to determine whether additional witnesses or other evidence will be allowed in light of the principles set forth in this opinion.

As to the judgment, first, we reverse the portion limiting recovery on the Porterville class's meal period claim to violations occurring between November 17, 2012, through June 14, 2017, and restricting the class period to these dates. On remand, the court shall recalculate damages on this claim so they reflect meal period violations occurring at Porterville between October 22, 2010, and June 14, 2017, and it shall expand the class period for this claim accordingly. Second, the portion of the judgment awarding individual PAGA penalties to plaintiffs Jorge Luis Estrada, Paulina Nava Medina, Jose Garcia, and Martin Garcia is reversed based on our finding that the court improperly dismissed their representative PAGA claim as unmanageable. Finally, we reverse any

48

portion of the judgment that is inconsistent with this opinion.  The judgment is affirmed in all other respects.  Each party shall bear their own costs on this appeal.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.